HAYNES v. TENNESSEE CENT. RY. CO. (Two Cases).—150 S. W. (2d) 1078.

Middle Section.  February 17, 1941.

Petition for Certiorari Denied by Supreme Court, May 17, 1941.

J. B. Daniel, of Nashville, for plaintiff in error.

Walter Stokes and Roberts & Roberts, all of Nashville, for defendant in error.

HOWELL, J.   These cases are suits for damages for personal injuries brought by William Haynes, a boy about ten years of age, for himself, and by his mother, Mrs. G. E. Haynes, for loss of services and expenses incurred by reason of the injuries to her son, against the defendant Tennessee Central Railway, growing out of an accident at a grade crossing on Belmont Boulevard near the southern corporate limits of Nashville.

The cases were tried together, by consent, in the Circuit Court of Davidson.

The accident happened on January 15, 1937, and the cases was heard in March, 1940.

The declarations contain practically the same allegations of facts, the substance of which are that the boy William Haynes was injured at the railroad crossing mentioned when the bicycle upon which he was riding was struck by an engine of the defendant, while the boy was riding south on Belmont Boulevard and the engine and cars of the defendant were traveling east on the track of the defendant railway; that it was practically impossible for a person proceeding southwardly on Belmont Boulevard to see or hear the approach of a train going eastwardly upon this track until such person is practically on the track; that the defendant did not maintain a watchman or traffic signal at the crossing which is in a thickly populated section and that the situation was dangerous and unsafe for the traveling public; and that on the afternoon of January 15, 1937, the plaintiff William Haynes, with a number of other boys, was playing in the vicinity of the crossing and while playing he rode a bicycle toward the crossing and that he was unable to see or notice the approach of the train until

he was practically on the crossing and that as he got on the track he was unable to get out of the way and that the train, going at a high rate of speed, struck him dragging him down the track and inflicting serious and painful injuries.

The second counts of the declarations make the additional allegation that Section 4006 of the 1932 Code was violated, in that the rails of the track projected above the level of the roadway and that there were bumps and holes in the roadway near and between the rails.

It is also alleged that the sound of the train and whistle was deadened by the train passing through a cut west of this crossing and that a view of the approaching train was obstructed.

The defendant filed pleas of not guilty.

The cases were heard in the Circuit Court of Davidson County by the court and a jury and at the close of all the proof the court granted a motion for peremptory instructions and dismissed them. A motion for a new trial was overruled and the plaintiffs have appealed in the nature of a writ of error and have assigned errors, all of which are directed at the action of the court in granting the motion for instructions and denying the motion for a new trial.

There are eleven assignments of error which will be considered together.

There is no evidence in the record and therefore none cited in the assignments of error and brief that any bumps or holes in the roadway had anything to do with or contributed in any way to the accident, and there is no error in the action of the court in sustaining the objections of the defendant to this testimony as to holes and bumps being there. The plaintiff testified that he was riding the bicycle southwardly and about midway of the road when he heard the whistle of the engine and when he got almost to the track he saw the train and then says:

"Q. Now, when you heard the train blow, how many whistles did you hear? Just the one, or did you hear two or three or more? A. I think I heard about two or three.

"Q. Two or three; were they long whistles, or just little short toots? A. Short ones.

"Q. Eh? A. Short ones.

"Q. Did they sound loud, or did you have some trouble about hearing it? A. Well, I don't know; it sounded pretty plain.

"Q. About like they always do? A. About like they did then.

"Q. There wasn't anything that called our attention to the fact that there was a train coming except the whistle, was it; that is all you heard, was it? A. No, sir, it blew an echo down that way, and naturally I looked down that way and didn't see anything.

"Q. Did you stay in the middle of the road when you started across the track; were you still in the middle of the road, or did you cut to

one side or the other? A. I tried to go to the left, kind of across the tracks, because I knew it would be easier to get across; I could get across the track quicker if I did that; I couldn't get across quick enough.

"Q. Tried to go to the left? A. Yes, sir.

"Q. Now, Bill, you know when you are riding in between or close to the street car tracks, when you cut across you have to cut sharp to keep from hanging your wheels and sliding? A. Yes, sir.

"Q. And that is what you were trying to do? A. Yes, sir.

"Q. Did you cut pretty sharp to your left? A. I cut kind of like that way (indicating), kind of glancing.

"Q. Did you cut before you got to the track or after you got to the track? A. Well, I cut when I saw I couldn't get over that last rail there, I decided I would cut kind of slanting that way.

"Q. You didn't cut as you went over the first rail, then, did you? A. No, sir.

"Q. What were you looking at, Bill, just before you looked up there and saw the train; were you looking at the Hailey boy? A. Yes, sir, I was looking at him, and then I looked up there, and, I didn't know, I looked up that way toward the Granny White Pike and I didn't see the train and turned around and looked at him and turned around and looked and saw that train and—

"Q. In other words, you looked to your left towards the Granny White Pike and saw no train? A. Yes.

"Q. And then you looked at the Hailey Boy? A. Yes, sir.

"Q. And then, when the train was right there close to the edge of the crossing, you, for the first time, looked up and saw it? A. Yes, sir.

"Q. And your bicycle had a brake on it, didn't it, a coaster brake, you call it. A. Yes, sir, but it wasn't any account much.

"Q. Had you got your wheels over the second rail when you were hit, Bill, or do you know? A. No, sir, I got it hung on the second rail; the wheel was stuck—well, it wasn't stuck, but it just didn't go over the second rail.

"Q. Well, you were turning to the left and going at an angle when it occurred, wasn't you? A. Yes; didn't get over second rail.

"Q. So, as a matter of fact, the train hit you pretty close to the left hand side of Belmont Boulevard, didn't it? A. Yes, sir.

"Q. Hit you more to the left than it did to the center, didn't it? A. Yes, sir.

"Q. Because you had turned to your left some from the center? A. Yes, sir."

Thus it appears that the boy was riding his bicycle toward the railroad tracks, he heard and saw the engine and instead of stopping he attempted to turn to the left and slid his bicycle wheel along the rail. He did not say that he could not have stopped his bicycle as the other boys had done who were standing there.

It is assigned as error that the court should have permitted the jury to pass upon the question as to a violation of the statute by the defendant in allowing the south rail of its track to project above the street level. The statute alleged as having been violated as a ground of negligence is Sec. 4006 of the Code which is as follows:

"*Tracks not to obstruct travel on highways, streets, etc.*—The line or track of the road shall be so constructed as not to interfere with the convenient travel of the public along the highways, county roads, streets, and alleys of cities, towns, and villages, and so as to allow vehicles conveniently and safely to pass over or under the line or track, and so as not to interrupt travel on foot or horseback, or in vehicles of any kind, in the proper use of the public road, street, or alley in the usual and proper mode for their convenience."

In addition to this the evidence was not subject to reasonable dispute that there was a substantial compliance with the statute, and it does not appear that any projection of the south rail caused the accident.

It is also assigned as error that the trial judge refused to let plaintiff examine witnesses as to other crossings in and around Nashville where the defendant did not have watchmen, gates and other warning signals.

We see no error in this as it could have had no bearing on any allegation of negligence in connection with this accident.

The failure of the railroad to have a watchman or signal lights at the crossing under the testimony of the plaintiff in this case could not have had any connection with the accident as he testified that he saw the train and heard the whistle.

The physical facts as undisputedly shown by the photographs exhibited in this record do not disclose anything that could make this an extrahazardous crossing.

The injured plaintiff had lived within a city block of this crossing practically all his life and had been in the habit, with other boys, of playing in sight of and around the crossing.

From careful examination of all the testimony in this record there is no difference in the testimony of any of the witnesses as to how the accident happened and what caused it. The testimony of the plaintiff, part of which is above quoted, is not in conflict with that of J. L. Skelley, the foreman of the train crew who was riding on the left side of the engine and looking at the boy. He says when asked what the boy was doing:

"A. Well, he was just riding along, looked to me like, and laughing, just as kids would be.

"Q. When he got up there pretty close to where those boys were, did he do anything else? A. Well, I couldn't say, for I didn't pay any attention to that; I was watching the kid.

"Q. Watching what? A. I was watching the kid; I couldn't say whether he done anything or not.

"Q. Did he ever stop before he rode on ahead of the engine? A. He didn't stop, no; he did not, no.

"Q. Did you holler before he got on the track—or did you holler at all? Let me ask you that? A. Yes, I hollered before he got on the track.

"Q. What did you do that for? A. To warn the engineer to stop; I saw the kid wasn't going to stop, and I hollered at the engineer.

"Q. Why didn't you holler before you did A. Well, I naturally thought the kid was going to ride up to the crossing and drop off his bicycle; he wasn't riding so fast but what he could drop one foot on the ground and straddle the bicycle, like the rest of them; that is what I thought he was going to do.

"Q. When you saw he wasn't going to do that, what did you do? A. I hollered at the engineer.

"Q. What did you say? A. I hollered 'Stop, a boy is coming in front of us.'

"Q. What did the engineer do? A. He put the brakes in emergency.

"Q. Do you know what it means when you holler, 'That will do.' A. Yes, sir, to put the brakes down.

"Q. Did anybody else holler besides you? A. The fireman and switchman, all three of us hollered.

"Q. What did the engineer do when you did that? A. Well, he applied his brakes in emergency, applied them at once.

"Q. Applied what? A. Applied the brakes right then, what we call 'big holing'; we call it 'big holing' when you apply the brakes in emergency, slip it in the big hole, we call it; that is our railroad slang for it."

The fireman J. W. Myers and the switchman W. H. Kilcoin were also riding on the left side of the engine cab with the foreman, and they testify that the boy was looking right at them and laughing and corroborate the foreman as to how the accident happened.

They also say that the engine was traveling eight or ten miles an hour.

We can find no negligence on the part of the defendant railway or its servants in this record.

A similar case is Southern Railway Co. v. Whaley, 170 Tenn., 668, 98 S. W. (2d), 1061, 1063.

This was a case of a thirteen year old girl walking upon the railroad track, and in an opinion by Justice Chambliss in which he dismissed the case he said:

"Considering the determinative facts that we have set forth, is there any material evidence that this engineer omitted to do what a reasonably prudent man, mindful of human life, would have done? He had blown for the crossing and was approaching it at a reason-

able speed, 35 to 40 miles an hour, his train in full and unobstructed view, for 1,500 feet, of person using the road. He observed that the car coming up from the south stopped, the occupants having quite naturally seen his train. He observed the deceased walking slowly toward the crossing and saw her come upon the northbound track, a place of clear safety. Should he have anticipated that she would wholly fail to stop, look, or listen, would fail to see or hear this train of twelve cars, making a noise heard some distance away by plaintiff's witnesses? Should it have occurred to him that this pedestrian would not stop for the train to pass, but would walk right on into collision with the train? It is a matter of common knowledge that persons walking along a street or highway, seeing an approaching passing train, continue to walk on up to a point only a few feet from the track and there stand. Is one thus acting in apparent imminent peril calling for preventive or protective action from the train crew? It is a rare and unexpected occurrence for a pedestrian, strolling along a road, to come upon a railroad track, down which in plain view a train is coming, and fail to pause and give to the train the right of way. All human experience and every reasonable presumption is against it. One has a right to assume that a person will exercise ordinary care for his own safety.''

The evidence in this cause is without material conflict and is such that we do not believe that reasonable men could reach other than the same conclusion therefrom; that there was no negligence of the defendant upon which a verdict could have been based. Carey Roofing & Mfg. Co. v. Black, 129 Tenn., 30, 37, 164 S. W., 1183, 51 L. R. A. (N. S.), 340.

We therefore conclude that it was not error for the trial court to grant the motion for instructions.

All assignments of error are overruled, and the judgment of the lower court affirmed.

The costs of the appeal will be assessed against the plaintiffs in error.

Affirmed.

Crownover and Felts, JJ., concur.